# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOHN M. ROBB, DVM,

              Plaintiff,

    v.

CONNECTICUT BOARD OF
VETERINARY MEDICINE, B. KENNETH
BERNHARD, THERESA CIANCILO,
DVM, MARY ANNE O'NEILL, TIMOTHY
PLUNKETT, DVM, and ALFREDO
SANCHEZ-ZONDONO, DVM,

              Defendants.

3:15-CV-00906 (CSH)

**JANUARY 20, 2016**

## RULING ON DEFENDANTS' MOTION TO DISMISS, PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, AND PROPOSED INTERVENER'S MOTIONS

**HAIGHT, Senior District Judge:**

Plaintiff Dr. John M. Robb, D.V.M., a doctor of veterinary medicine licensed in the state of Connecticut, brings this action for injunctive relief and damages under the Sherman Antitrust Act, 15 U.S.C. § 1, against Defendants, the Connecticut Board of Veterinary Medicine (the "Board")[1] and its five constituent members: B. Kenneth Bernhard, Dr. Theresa Cianciolo, D.V.M., Mary Anne O'Neill, Dr. Timothy Plunkett, D.V.M., and Dr. Alfredo Sanchez-Zondono, D.V.M (together, the "Individual Defendants," and with the Board, the "Defendants"). The gravamen of Plaintiff's

---

[1] The Board "is a quasi-private, quasi-public agency established under the laws of the State of Connecticut, charged with regulating the licensing and practice of veterinary medicine in Connecticut." Am. Compl. [Doc. 30] ¶ 9. Pursuant to C.G.S. § 20-196(a), three of the five Board members must be practicing veterinarians. *Id.* ¶ 60. Here, that role is served by Defendants Ciancolo, Plunkett, and Sanchez-Londono (the "Veterinarian Defendants"). *Id.* ¶ 61.

complaint is that Defendants have conspired to restrain trade through an agreement to remove from the Connecticut market for veterinary services any veterinarian who offers certain reduced dosages of the rabies vaccine to animal-patients, and that the Board is currently effectuating this anticompetitive scheme through an administrative proceeding against Plaintiff.

On June 12, 2015, Plaintiff filed his initial complaint, a motion for a temporary restraining order ("TRO") and a motion for a preliminary injunction ("PI"), all aimed at forestalling Defendants' administrative proceedings against him.  Docs. 1-5.  The Court denied Plaintiff's TRO motion on the same day, [Doc. 11], but reserved decision on the PI motion, which is pending.  Following a June 18, 2015 hearing with this Court on his PI motion, Plaintiff filed an Amended Complaint.  Doc. 30. Defendants thereafter filed a motion to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, which is also pending.  Docs. 39, 44, 46.  Non-parties Charter Practices International, LLC and Medical Management International, Inc. ("Proposed Interveners") have filed joint motions to intervene in the action, [Doc. 21], and for joinder in Defendants' motion to dismiss, [Doc. 43].  This Ruling resolves all pending motions.

## I.      Background

The following recitation is taken principally from Plaintiff's Amended Complaint ("AC"), whose well-pleaded factual allegations the Court takes as true for purposes of this motion to dismiss.

In 2008, Dr. Robb acquired ownership of a Banfield Pet Hospital franchise ("Banfield") in Stamford, Connecticut pursuant to an agreement with Charter Practices International ("CPI"), a corporate franchisor.  AC ¶ 8.  As part of his practice at the hospital, Dr. Robb administered various animal vaccinations, including that for rabies.  In his first several months at the Banfield franchise, he administered "the manufacturer's standard recommended dose" of 1 milliliter of the rabies vaccine

2

to canines, regardless of the dog's size.  *Id.* ¶¶ 19, 22.  However, soon thereafter, a significant number of Dr. Robb's animal-patients experienced "vaccine-associated adverse events" or "VAAEs," particularly smaller breeds of dog.  *Id.* ¶ 22.  In light of this experience, and after review of a 2005 peer-reviewed study documenting a correlation between animal size and VAAEs,[2] Dr. Robb amended his hospital's vaccination policy such that it would administer only 0.5 milliliters to dogs under ten pounds.  *Id.* ¶ 24.  Dr. Robb offered lower dosages because he "was scientifically and morally unsatisfied with the unnecessary adverse reactions in companion animals from one-size-fits-all manufacturer's recommended dosages."  *Id.* ¶ 3.  Following the change in protocol, Dr. Robb's hospital saw an immediate reduction in VAAEs and thereafter incrementally expanded its reduced dosage policy to all breeds under fifty pounds.  *Id.* ¶ 25.

According to the Amended Complaint, the resulting success in reducing VAAEs was stark. In the period between 2010 and July 2015, other Banfield franchise hospitals experienced 300 cases of anaphylaxis, "one of the most severe and fatal VAAEs that can occur," leading to six deaths, while Dr. Robb's hospital had no such cases, all while not a single animal contracted any of the diseases for which they were vaccinated.  *Id.* ¶¶ 26-28.  Given these circumstances, Dr. Robb vehemently and with manifest conviction and sincerity alleges that he has an "ethical obligation" to provide lower-dose vaccinations to smaller animals and that to do so has "been decisively found to be within the standard of care."  *Id.* ¶¶ 3-4.  Further, he experienced a significant consumer demand for his lower-dose vaccinations.  *Id.* ¶ 3; *see also* Doc. 31, at 2 ("Patients flocked to his practice").

Not surprisingly, Dr. Robb's decision to offer lower than manufacturer-recommended doses

---

[2]	George M. Moore, *Adverse Events Diagnosed Within Three Days of Vaccine Administration in Dogs*, 277 J. Am. Vet. Med. Ass'n 1102 (2005)

led to direct conflict with certain institutional interests.  The Amended Complaint lists a number of adverse reactions with which Dr. Robb has been contending.

*First*, the Mars Candy Company, CPI's corporate parent, allegedly in retaliation for Dr. Robb's refusal to accept a "well-below-market" buy-out offer, used Dr. Robb's failure to provide the manufacturer's recommended vaccine dosage as a pretextual justification to terminate without justification his Banfield franchise agreement.[3]  AC ¶¶ 30-31.

*Second*, "the Connecticut Department of Public Health brought charges . . . against Dr. Robb stemming directly from his rabies vaccination procedures." *Id.* ¶ 33.  In an August 28, 2014 letter sent to Dr. Robb by the Board, the Board ordered Dr. Robb to appear "for a hearing on the attached Charges against [him]." Doc. 5-4, at 2-3.  The "attached Charges" referenced by the Board's letter consists of an August 1, 2014 "Statement of Charges" issued by the Connecticut Department of Public Health ("DPH").  *Id.* at 4.  The Statement of Charges states that "Pursuant to the General Statutes of Connecticut, §§19a-10 and 19a-14[4], the Department of Public Health . . . brings the following charges against John M. Robb." *Id.*  The principal and relevant charge at-issue against Dr. Robb is that he "instructed employees to administer half doses of rabies vaccines to animals under the weight of fifty pounds."  AC ¶ 39.  The Statement of Charges recites that, despite Dr. Robb's vehement protestations, the provision of lower than the manufacturer-recommended dosages of the rabies vaccine "constitute[s] grounds for disciplinary action pursuant to the General Statutes of

---

[3]      This dispute is being litigated concurrently in this District in front of Judge Chatigny. *Charter Practices International v. Robb*, No. 12-cv-01768 (RNC).

[4]      Section 19a-14 states that DPH has the power to "[c]onduct any necessary review, inspection or investigation regarding qualifications of applicants for licenses or certificates, possible violations of statutes or regulations, and disciplinary matters."

4

Connecticut, §20-202(2)."[5]   Doc. 5-4, at 4.   DPH then "prays that: The Connecticut Board of Veterinary Medicine, as authorized in §§19a-17 and 20-202, revoke or order other disciplinary action against the veterinary license of John M. Robb as it deems appropriate and consistent with law." *Id.* The Board ordered Dr. Robb to appear for a December 2, 2014 hearing on those charges. *Id.* at 1. It is this administrative proceeding that is at the core of the instant litigation before this Court.

Dr. Robb argues that there is no basis for the administrative action against him because Connecticut "state policy is ambiguous as to vaccination protocols generally and entirely silent on dosage amount."[6]   AC ¶ 63.   Rather, as discussed further below, Dr. Robb argues that the action is

---

[5]     C.G.S. §20-202(2) states that the Board may impose disciplinary action pursuant to Section 19a-17 where, *inter alia*, there is "proof that [a licensed veterinarian] has been guilty of . . . negligence towards animals[.]   In determining whether the holder of such license has acted with negligence, the board may consider standards of care and guidelines published by the American Veterinary Medical Association including, but not limited to, guidelines for the use, distribution and prescribing of prescription drugs."

[6]     Dr. Robb was not always of the view that state law is silent as to rabies dosages amounts. This is evident from various sources.  Dr. Robb stated the following at a January 7, 2015 hearing in front of the Defendant Board:

| MR. BERNARD: | Now, [whether you administered half dosages of rabies vaccine is] either true or not true.  If it's true, the reasons why you did it are not really anything we care about. |
| --- | --- |
| DR. ROBB: | Oh really. |
| MR. BERNARD: | There's a state statute that says you are to administer a full dose of rabies vaccine. |
| DR. ROBB: | That's wrong. |
| MR. BERNARD: | What's wrong? |
| DR. ROBB: | You should be interested. |
| MR. BERNARD: | No, no. |
| DR. ROBB: | ***The state statute is harming your pet because*** |

5

brought solely as part of a conspiracy by Defendants to eliminate competitors from the Connecticut veterinarian market that aim to compete with the Veterinarian Defendants by offering lower-dose vaccines.

To support his claims that the rationale for the disciplinary action against him for violation of state regulations is pretext, Dr. Robb alleges that at a hearing in front of the Defendant Board, the "Board's own veterinarian expert witness, Dr. Jeffrey Loeven," testified clearly that Dr. Robb caused no harm to his animal-patients, that he "'fully agree[s] with [Dr. Robb's] assertion that you can modify the practice of medicine according to the Aesculapian authority,[7] including the Hippocratic oath,'" and that Dr. Robb's "'approach resulted in fewer reactions based on limited titers done and lack of documented disease breaks.'" *Id.* ¶¶ 41, 43 (quoting March 27, 2015 testimony).[8]

---

**it's outdated.**  You should be interested.

Doc. 20-2, at 120 (emphasis added).   Additionally, in his Second Amended Answer in the administrative proceeding, he argued that Conn. Agencies Regs. 22-359-1 is "**an unconstitutional delegation of powers,**" but also referred to it as a "regulatory requirement . . . to administer the rabies vaccine in accordance with the private for-profit manufacture's label directions." Doc. 5-7, at 2.  Further, in his initial TRO and PI papers, he refers to this as an "outdated regulation." Doc. 5-1, at 10.  He also admits Section 22-359-1 is a regulation that "arguably requires that a veterinarian follow for-profit manufacturer label instructions when administering rabies vaccines." *Id.* at 13.

[7]    Dr. Robb explained in his memorandum of law in support of his TRO and PI that the "Aesculapian Authority is the power of physicians to choose for their patient what they believe is the best practice," a "power [that] is now available to Veterinarians because of companion animal practice." Doc. 5-1, at 7 n.1 (citing Bernard E. Rollin, PhD, *An Introduction to Veterinary Medical Ethics, Theory and Cases*, at 84 (2d ed. 2006)).  The adjective "Aesculapian" is derived from Aesculapius, the Greco-Roman god of medicine.

[8]    There are a several issues with Plaintiff's citations to Dr. Loeven's March 27, 2015 testimony.  *First*, his name is Dr. Koen Loeven, not Dr. Jeffrey Loeven.  Doc. 39-4, at 8.  *Second*, this witness was called by DPH, and thus is not the Defendant Board's witness. *Id.* ("The Department calls Dr. Loeven to the stand").  *Third*, and most significantly, in a section omitted from Plaintiff's excerpted submission from the transcript, Dr. Loeven testified that: "My function was to review the case as to the standard of care under Connecticut statute and also veterinary

In consequence, Dr. Robb alleges that the Defendant Board has no basis "to pursue its baseless action against [him]" because it "and its veterinarian members have no medical, health or safety reason to pursue veterinarians like Dr. Robb that offer vaccination services with lower doses for smaller animals." *Id.* ¶ 44.  Rather, at the core of his antitrust complaint, Dr. Robb alleges that the Board "pursues its" action "for the anticompetitive reason that offering such services threatens the profits that veterinarians, including three board members, make from vaccinations." *Id.*  To effectuate their anticompetitive goals,

> the Board, along with the Individual Defendants, entered into an agreement to prevent competition on quality and price by excluding from the relevant service market any doctor of veterinary medicine who does not provide the manufacturer's recommended dose for rabies vaccinations.  The agreement and conspiracy includes the Defendants' decision to pursue sanctions against Dr. Robb.

*Id.* ¶¶ 67-68.  Dr. Robb also alleges that "[a]s part of Defendants' agreement and conspiracy, Defendants have communicated to the relevant purchasing public that Dr. Robb is currently under investigation for  professional misconduct." *Id.* ¶ 72.  Dr. Robb then alleges that "Defendants' conduct has no procompetitive or business justification." *Id.* ¶ 73.

Dr. Robb does not allege any specific conduct actually engaged in by the Board's members that would constitute an "agreement" or a "conspiracy."  Rather, Dr. Robb relies on circumstantial factors, specifically the Veterinarian Defendants' "direct pecuniary motivation" to preclude the availability of size-appropriate vaccinations.  *Id.* at 18.  He alleges that "the three veterinarian members of the Defendant Board use vaccination protocols that rely solely upon the manufacturer's

---

guidelines and *I believe that the use of half volume rabies vaccination is against State statute and also against the standard of care*." *Id.* at 10 (emphasis added); *see also id.* at 13 (Plaintiff's letter response to Dr. Loeven "did not change the main core of my review that the standard of veterinary care was violated").

recommended dosage," and that therefore a market for vaccinations that deviate from that protocol "represent[s] a direct financial threat to the veterinarian Individual Defendants." *Id.* ¶¶ 56-57.

It is through the above conduct that Dr. Robb alleges that he, and the Connecticut markets for vaccination and veterinary services more generally, were harmed. Dr. Robb alleges repeatedly that the Defendants' actions harm the Connecticut market for vaccination and veterinarian services, of which Dr. Robb alleges vaccination services account for seventy percent. *Id.* ¶¶ 47, 55; *see also* Doc. 31, at 1 (vaccinations are "the golden goose of veterinarian practices"). Specifically, he alleges that his

> competitors on the Connecticut Board of Veterinary Medicine—a quasi-private, quasi-public entity dominated by doctors of veterinary medicine in active, private practice—have restrained competition by declaring these safe, effective, and heretofore legal vaccination practices as a violation of their own vaguely drafted administrative rules.

*Id.* ¶ 4. Dr. Robb alleges that the practical effect of this restraint on competition has been to improperly obstruct a demonstrated demand for "size-appropriate vaccination dosages," *id.* ¶ 46, both from veterinarians,[9] and from consumers.[10] Apart from harm caused by market disturbance, Dr. Robb also alleges that he is harmed directly through the administrative proceeding because his

---

[9]     Dr. Robb alleges that there are "multiple doctors of veterinary medicine," such as Dr. Marcus Suppa, D.V.M., who either "ceased providing size-appropriate vaccination dosages or [] entertained the possibility of offering size-appropriate vaccination dosages and have decided not to offer them as a direct result of the Defendants' anticompetitive actions." *Id.* ¶ 52.

[10]     Dr. Robb alleges that "owners of pets who are concerned about or who have experienced VAAEs as a result of needless, one-size-fits-all vaccine dosages have flocked to his practice." *Id.* ¶ 50. Dr. Robb also alleges that "[m]any individual pet owners on [*sic*] Connecticut would, if they had the opportunity, purchase vaccination lower-dosage services for their small pets." *Id.* ¶ 53. Dr. Robb then identifies one such patient who "demand[s] and desire[s] half-dosages of vaccine for [her] smaller pets [and] will be unable to contract for them" because of the Board's action. *Id.*

license, "professional reputation, goodwill, and livelihood [are] at stake," *id.* ¶ 75, and because "if successful, [it] will also jeopardize [his] $6.5 million in counterclaims against Banfield in a related federal case," *id.* ¶ 74.

Moreover, the Board, pursuant to its adjudicative function, has sufficient market power to effectuate such an anticompetitive effect "because they have the power to exclude any competitor from the practice of veterinary medicine in Connecticut." *Id.* ¶ 49; *see also id.* ¶ 64 (the Veterinarian Defendants "have the power to take collective action against Dr. Robb and any other veterinarian that seeks to offer better, different, or lower cost services relating to vaccinations").

In short, "[t]he anticompetitive actions of the Board, acting as a trade association, directly restrain trade by protecting the veterinarian establishment from the competition that would come from veterinarians, like Dr. Robb, who would adopt the reduced volume vaccine protocol." *Id.* ¶ 54.

In light of the above alleged conduct, Dr. Robb's Amended Complaint asserts a single claim for violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, against all Defendants in their individual and official capacities, for "Conspiracy to Restrain Trade – Group Boycott." Dr. Robb seeks injunctive relief, treble compensatory damages under 15 U.S.C. § 15(a), and his costs and expenses in bringing the instant action. AC, at 23.

## II.    Defendants' Motion to Dismiss

Defendants argue that Plaintiff's claim should be dismissed in full for a significant number of independent reasons, which they group together as follows. Doc. 39. *First*, this Court lacks subject matter jurisdiction because: (i) Dr. Robb lacks Article III standing; (ii) Dr. Robb lacks the more particularized "antitrust standing"; and (iii) Dr. Robb's claims are not ripe for review. *Second*, the 11th Amendment bars claims (i) against the Board and (ii) for monetary damages against the

Board members in their official capacities. *Third*, the Individual Defendants are immune from suit either pursuant to absolute or qualified immunity. *Fourth*, Dr. Robb failed to allege in substance an antitrust claim. *Fifth*, this Court should not interfere with an ongoing state administrative proceeding in light of the abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971). And *Sixth*, Dr. Robb has failed to exhaust his administrative remedies. The Court will address the substance of Defendants' arguments, as necessary, below.

## III.   Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles, " *id*. at 678.

*First*, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"*Id.* (quoting *Twombly*, 550 U.S. at 557. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

*Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556

10

U.S. at 679.  This "facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678. Importantly, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief [is] . . .  a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

## IV.   Analysis

The Supreme Court has "direct[ed] federal courts to resolve questions of Article III jurisdiction before reaching the merits of a plaintiff's claim."  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (citing *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94 (1998) ("declin[ing] to endorse . . . an approach [of 'hypothetical jurisdiction'] because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers")).

The Court therefore begins with Defendants' jurisdictional arguments—that Plaintiff lacks Article III standing and that his claims are not yet ripe.[11]  Only if Plaintiff prevails on those initial

---

[11]     Defendants argue that"antitrust standing" is a jurisdictional question.  Doc. 39-1, at 14 n.6 (citing *Balaklaw v. Lovell*, 14 F.3d 793, 800 (2d Cir. 1994)).  *First*, *Balaklaw* does not address the question of the jurisdictional nature of antitrust standing.  *Second*, while the question has been the subject of some debate, the Second Circuit has cited with approval the D.C. Circuit's "holding that statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction."  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 107-08 (D.C. Cir. 2002) ("Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing."); *see also Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 468 (2d Cir. 2014) ("statutory

issues will the Court be in a position to consider the merits of Plaintiff's antitrust claim.

As to that separate issue, Defendants contend on their motion to dismiss that Plaintiff's Amended Complaint fails as a matter of law to state an antitrust claim under the Sherman Act.

I discuss in order the related but separate issues of Plaintiff's standing to assert his claim and the legal viability of that claim as pleaded.

## A.  Subject Matter Jurisdiction

Subject matter jurisdiction is a prerequisite for an adjudication in federal court.  A federal district court has no subject matter jurisdiction over claims for which a plaintiff lacks Article III standing.  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012).  The same is true as to claims that are unripe.  *U.S. v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002).  The Court turns to these issues now.

### 1.  Article III Standing

Defendants argue that Plaintiff's complaint fails to meet the "'irreducible constitutional minimum of standing.'"  Doc. 39-1, at 12 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  As recently reiterated by the Supreme Court, "[t]he requirements of Article III standing are familiar."  *U.S. v. Windsor*, 133 S. Ct. 2675, 2685 (2013).   "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural or hypothetical.'  Second, there must be a causal connection between the injury and the conduct complained of . . . [and] [t]hird, it must be 'likely' . . . that the injury will be 'redressed by a favorable decision.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560-61)

---

standing is not jurisdictional unless Congress says so").  Therefore, the Court need not address Defendants' antitrust standing argument as part of its Article III jurisdictional analysis.

(footnote and citations omitted)).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.  I consider those elements in that order.

### a.  Injury-in-Fact

Dr. Robb has alleged injuries that are current, "concrete," "particularized," and "actual." Principally, Dr. Robb alleges an "antitrust injury"—a  harm to the market for veterinary services—which is "sufficient to satisfy the constitutional standing requirement of injury in fact." *Associated Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519, 551 n.31 (1983).  Specifically, Dr. Robb alleges that he—and other like-minded veterinarians—cannot properly compete in the market because they "cannot provide size-appropriate vaccinations" given the administrative proceedings that they face.  AC ¶ 51.  Because, "[f]or purposes of determining standing, we 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party,'" Dr. Robb has sufficiently alleged an injury-in-fact. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Defendants' arguments do not lead to a contrary result.  *First*, Defendants confusingly argue that Dr. Robb was not injured because his "allegation that the Board has prevented him from competing on quality is unfounded" in light of the fact the Board did not "promulgate the statutes or regulations that Plaintiff claims prohibit him from competing."  Doc. 39-1, at 12-13.  Whether or not it was the Defendants' actions that harmed Plaintiff goes to the element of causation—it is irrelevant in determining an injury-in-fact.  *Second*, they argue that Dr. Robb has not suffered an injury because the Board has yet to make any determination as to whether he in fact committed the regulatory violations with which he was charged.  *Id.* at 13.  However, in so arguing, Defendants

ignore this action's antitrust context.  As discussed above, Dr. Robb does not only allege injuries stemming from a potential adverse determination in the administrative proceeding against him; he alleges that the proceedings against him have dissuaded him and others from competing as to dosages.[12]  Also, it is not the case that a plaintiff lacks standing *ipso facto* when his alleged injury stems from the potential future effect of a yet-to-occur government action.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342-43 (2014) (discussing Supreme Court "cases [that] illustrate the circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III").  Plaintiff has alleged an injury-in-fact.

However, Plaintiff then argues that his allegation of antitrust injury is sufficient to confer Article III standing *in toto*.  Doc. 44, at 7 (citing *Assoc. Gen.*, 459 U.S. at 551 n.31).  Plaintiff is mistaken.  As made clear in *Assoc. Gen.*,"[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement *of injury in fact*."  459 U.S. at 551 n.31 (emphasis added).  Dr. Robb still must sufficiently allege the remaining two elements of Article III standing.

---

[12]        In this regard, this case is distinct from *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013), in which the Court rejected plaintiff's standing theory that it was injured through the adoption of certain costly measures it took in anticipation of the government's use of a regulatory power in a way that might injure it.  There, where the government had not even taken action with respect to the regulation at issue, the Court denied this standing theory because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id*. at 1152.  Here, where Dr. Robb is already facing regulatory sanctions (in the form of forcing him to refrain from providing lower dosages), he has caught a "chill" from standing in the face of the adverse wind of the administrative proceeding, and that chill is objective, not subjective, since Dr. Robb is required to defend himself against the administrative charges.  Dr. Robb clearly stands in the face of a "threat of specific future harm," a circumstance sufficient at this stage of the case to constitute Article III "injury."

### b.  Causal Connection

To have Article III standing, a plaintiff must show "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation omitted).  However, "the 'fairly traceable' standard is not equivalent to a requirement of tort causation. . . . [F]or purposes of satisfying Article III's causation requirement, we are concerned with something *less than the concept of proximate cause*." *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (internal quotation and citation omitted, emphasis in original).  "Rather, 'at [the pleading] stage of the litigation,' the plaintiffs' 'burden . . . of alleging that their injury is 'fairly traceable' to' the challenged act 'is relatively modest.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)).

As Defendants repeatedly note—and as demonstrated through sources with which this Court may consider at this stage—Dr. Robb is undoubtedly incorrect when he posits that it is the Defendant Board that has brought the administrative proceeding against him.  As made clear by, *inter alia*, the Statement of Charges attached to Dr. Robb's initial complaint, it is the Connecticut "*Department of Public Health* [that] brings the [at-issue] charges against John M. Robb."  Doc. 5-4, at 4 (emphasis added).  Defendants use this fact to opine, quite accurately, that the "actions that Plaintiff complains against are actions traceable to the Legislature, the Commissioner of Agriculture, and the Department of Public Health.  All parties not before the Court."  Doc. 39-1, at 13.  Despite its truth, it proves too much to argue that this fact alone leads to the conclusion that Dr. Robb does not have standing to bring this action.

Although other parties may be the *proximate causes* of Dr. Robb's alleged injuries, the issue

here is whether Plaintiff's alleged injuries can meet the "relatively modest" test of being "fairly traceable" to the Defendants' alleged conduct.   The demonstrated factual inaccuracies in the Amended Complaint aside, Dr. Robb makes the following allegation:

> [T]he Board, along with the Individual Defendants, entered into an agreement to prevent competition on quality and price by excluding from the relevant service market any doctor of veterinary medicine who does not provide the manufacturer's recommended dose for rabies vaccinations.

AC ¶ 67.   If that be true,[13] the alleged injuries—*i.e.*, veterinarians not being able to provide lower-dose vaccinations—is "fairly traceable" to the Board's conduct in light of the fact that the adjudicator of any administrative proceeding challenging such vaccination procedures is likely, on Plaintiff's theory of the case, to have predetermined its outcome for anticompetitive reasons.   In other words, Dr. Robb—and other like veterinarians—have been forced to "chill" their behavior, and thus they and the veterinarian market have suffered an injury, at least in part because of the knowledge that their potential or actual adjudicators have formed an agreement to remove them from the relevant market.   Although the proximate cause of that chill may be the DPH, which decides to pursue sanctions in the first place, it cannot be said that a partial adjudicator of those charges is not also *a* cause of said chill.   Dr. Robb has met his "relatively modest" burden of alleging a causal connection between the Board's conduct and the alleged injury.

_____

[13]   The Court acknowledges (as made clear below) that for purposes of establishing an antitrust claim, the "ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation," and thereby should not be accepted as true for purposes of a motion to dismiss.  *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).  However, for purposes of standing, the Court may accept as true that the individual Defendants entered into an agreement without accepting the "ultimate existence of an 'agreement'" as that term is used with respect to the antitrust laws.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 ("an injury-in-fact," for standing purposes, "differs from a 'legal interest'; an injury-in-fact need not be capable of sustaining a valid cause of action").

### c.  Redressability

Finally, to have standing, a plaintiff must show that his alleged injury "can likely be redressed by a favorable decision."  *Mantena v. Johnson*, – F.3d –, 2015 WL 9487867, at *8 (2d Cir. Dec. 30, 2015) (citing *Lujan*, 504 U.S. at 560-61).  Defendants argue that Dr. Robb's injury is not redressable by this Court because an injunction against the Board's disciplinary proceeding "would not change the rabies statute or regulations [which] would still prohibit veterinarians from administering rabies vaccines in the manner Plaintiff wishes."  Doc. 39-1, at 13-14.

However, in line with the above analysis, Defendants' argument can quickly be dispatched. Dr. Robb alleges a harm to the veterinarian market effectuated through an administrative adjudication infected by an anticompetitive conspiracy.  In short, Dr. Robb argues that the Board will not fairly address a question of Connecticut law—whether veterinarians providing lower-dose vaccinations violate the law—because it has agreed to exclude these veterinarians from the market for reasons entirely unrelated to the purpose behind any regulatory vaccination requirement.  To redress that injury to the market, Dr. Robb seeks, in part, permanent injunctive relief barring the Defendants from illegally conspiring to remove veterinarians from the market on the basis of an anti-competitive rationale, rather than impartially applying Connecticut law.  *See* AC, at 23.  Such relief is likely to redress the illegally caused harm to the veterinarian market.

Plaintiff has standing to bring this action.

### 2.  Ripeness

"The doctrine of constitutional ripeness 'prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur.'"  *In re Methyl Tertiary Butyl Ether (MTBE) Prods Liab. Litig.*,

725 F.3d 65, 110 (2d Cir. 2013) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008)).  As is therefore apparent, "[t]his aspect of the ripeness doctrine overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *Id.* (quoting *Ross*, 524 F.3d at 226) ("In most cases, that a plaintiff has Article III standing is enough to render its claim constitutionally ripe.").

Here, Defendants argue that Dr. Robb's claim is not ripe for review because the Board has yet to issue a decision.  Doc. 39-1, at 18.  As Defendants acknowledge, this is the same argument it made "[a]s with the standing issue." *Id.*  The Court denied this argument as to standing, and it denies Defendants' argument as to ripeness for the same reasons.  Further, the Second Circuit has also held that "[i]n the antitrust context in particular, a rule that has yet to be enacted or enforced may be ripe for review if its mere proposal is likely to inhibit competition." *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 64 (2d Cir. 1988).

In the case at bar, Dr. Robb alleges that competition has already been inhibited by Defendants' illegal agreement to remove certain competitors from the market in light of the proceedings against him.  His claim is thereby ripe for review, and, in light of the Article III standing analysis *supra*, I conclude that this Court has subject matter jurisdiction over this action.

### B.  Antitrust Claim

Although Plaintiff has standing to assert his claim, that claim is nonetheless subject to dismissal if it has no merit as a matter of law.  Defendants contend that Plaintiff's claim against them has no merit because, *inter alia*, it fails to plead an antitrust claim that is cognizable under the Sherman Act.

Plaintiff brings a one-count complaint alleging a violation of 15 U.S.C. § 1, which states that:

18

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

The threshold question of a Section 1 claim is "whether an arrangement is a contract, combination, or conspiracy," a question"informed by the basic distinction in the Sherman Act between concerted and independent action." *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186, 190 (2010) (internal quotation omitted). A state board comprised of a majority of private practitioners, such as the Defendant Board, is capable of illegal concerted action for purposes of Section 1. *See North Carolina State Bd. of Dental Exam'rs v. F.T.C.*, 717 F.3d 359, 371-72 (4th Cir. 2013), *aff'd* 135 S. Ct. 1101 (2015) ("Any agreement between the Board members . . . deprives the market of an independent center of decision making."). However, "concluding that the Board has the capacity to conspire 'does not mean . . . that every action taken' by the Board 'satisfies the contract, combination, or conspiracy requirement.'" *Id.* at 372 (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991)) (upholding a Sherman Act violation where "[s]ubstantial evidence support[ed] th[e] conclusion" of concerted action). In short, to survive dismissal, Dr. Robb must allege that the members of the Defendant Board affirmatively came together to form an agreement to restrain trade.

However, to satisfy the pleading requirement at the Rule 12(b)(6) stage, an antitrust plaintiff may not simply allege that "the parties agreed." This is because the "ultimate existence of an 'agreement' under antitrust law . . . is a legal conclusion, not a factual allegation." *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). Accordingly, any conclusory allegation of an "agreement" is not to be accepted as true; the plaintiff must allege *facts* affirmatively demonstrating such an agreement. *See Anderson News, L.L.C.*, 680 F.3d at 184 (plaintiff "must plead 'enough factual matter (taken as true) to suggest that an agreement was made,'

19

*i.e.*, it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement" (quoting *Twombly*, 550 U.S. at 556)). In *Twombly*, the Supreme Court laid out clearly the allegations sufficient for an antitrust plaintiff to overcome a motion to dismiss as to the element of conspiracy in a Section 1 claim:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57; *see also id.* at 567-68 (dismissing allegations of conspiracy where allegedly conspiratorial actors had "an obvious alternative explanation" for their parallel conduct).

That is not to say that an antitrust complaint must always identify a "smoking gun" evincing an agreement (such as a written contract). However, a complaint like this one, which omits a "smoking gun," may survive dismissal only if an actual agreement "'may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'" *Mayor and City Council of Baltimore*, 709 F.3d at 136 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). A "plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "'These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Mayor and City Council of Baltimore*, 275 F.3d at 198 (quoting *Twombly*, 425 F.3d at 114).

20

In the case at bar, Dr. Robb makes only conclusory allegations as to an agreement among the Individual Defendants, either tacit or express.  The Amended Complaint does not describe any action to that effect engaged in by any of the Individual Defendants.  The pleading refers to the alleged conspirators by name only once, and then only to identify the parties to the litigation.  AC ¶¶ 10-14. By failing to make a single allegation as to the conduct of the individuals that allegedly came to an illegal agreement, nor as to the form, dates, place, structure, or detail of such an agreement, Dr. Robb faces a significant hurdle, as a matter of law, to support his claim of an antitrust conspiracy.  To establish the factual underpinning of an actual "agreement," a party must allege facts that in some way describe the process of that agreement's formation.  For example, in *Anderson News*, the Second Circuit overturned the lower court's ruling that plaintiff's claims were overly conclusory in light of the fact that:

> The [complaint] allege[d] actual agreement; it allege[d] not just that all of the defendants ceased, in virtual lock-step, to deal with Anderson, but allege[d] that on various dates within the preceding two-week period defendants and News Group—through their executives, 10 of whose names or positions are specified—had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement to attempt to eliminate Anderson and Source as wholesalers in the single-copy magazine market and to divide that market between News Group and Hudson.

680 F.3d at 186-89 (holding that in light of these allegations, the complaint "in the present case is vastly different from the complaint at issue in *Twombly*").  The Second Circuit's decision in *Anderson News* may be contrasted with its ruling in *Mayor and City Council of Baltimore*, which rejected a conspiracy claim as impermissibly conclusory even though the complaint alleged "two actual communications between competitors."  709 F.3d at 139 (emphasis omitted).  Dr. Robb makes not even a single such factual allegation as to the behavior of the individuals whom he accuses of

21

conspiring.

Without alleging any "gun" (let alone of the "smoking" variety), Dr. Robb must allege sufficient "conscious parallelism," or "interdependent conduct," from which an agreement among the Individual Defendants may be plausibly inferred. *See Ross v. Citigroup, Inc.*, – F. App'x – , 2015 WL 7292176, at *1 (2d Cir. Nov. 19, 2015). As shown below, this he also entirely failed to do. In other words, not only has Dr. Robb failed to allege any facts supporting an actual agreement (as discussed above), he has also failed to allege properly any facts alleging concerted conduct from which this Court could theoretically infer such an agreement. Dr. Robb has simply made no proper and acceptable allegations that the Individual Defendants have done *anything* to implement or further the conspiratorial agreement that he (conclusorily) alleges.

A review of the few actions of the Board that Dr. Robb has alleged demonstrates the inadequacy of the pleading. *First*, he alleges that the "Board has continued to pursue its baseless action against Dr. Robb." AC ¶ 44. However, it is indisputably true that the Board is *not* pursuing the administrative action against Dr. Robb, but merely sits in adjudication of charges that the DPH pursues, a fact Plaintiff largely admits in his pleading, *id.* ¶ 33, is made clear from the DPH's Statement of Charges, [Doc. 5-4], at 4, and is clear as a matter of Connecticut law, *see* C.G.S. §§ 19a-13(6), 19a-14(8), 19a-14(10)-(11), 20-196b, 20-204a.

*Second*, Dr. Robb purports to allege that the Board made a "decision not to dismiss the complaint upon failure of the case as a result of their own expert's testimony." Doc. 31, at 20. However, the Board did not deny Dr. Robb's motion to dismiss the complaint, it simply took "the motion under advisement" given that it had not "finish[ed] hearing the case" when Dr. Robb moved

to dismiss the action at a June 15, 2015 hearing.[14]  Doc. 34-1 Ex. C, at 80.  Such an action cannot

plausibly be used to infer that the Board members entered into an agreement to exclude Dr. Robb

from the market, and actually furthers the Board's contention that it was taking serious its role as an

impartial adjudicator.  Moreover, and as discussed, the expert referred to by Dr. Robb was that of

the DPH, not of the Board, and, in fact, that expert testified that Dr. Robb's conduct "*is against State*

*statute and also against the standard of care*."  Doc. 39-4, at 10 (emphasis added).  It would be

strange indeed for the Board to *grant* a motion to dismiss a complaint alleging a violation of a state

statute on the basis of an expert testifying that the respondent in fact committed the violation with

which he was charged.

     *Third*, in the introduction of his amended complaint, Dr. Robb alleges that the Board has

"declar[ed] . . . [his] legal vaccination practices as a violation of their own vaguely drafted

administrative rules."  AC ¶ 4.  However, it is quite clear that the Board has yet to make a decision

as to whether Dr. Robb has violated any rules.  *See*, *e.g.*, Doc. 31, at 21 (Dr. Robb referring to the

"Board's continued proceedings" against him).

     *Fourth*, Dr. Robb alleges that, as part of its conspiracy, the Board has "communicated to the

relevant purchasing public that Dr. Robb is currently under investigation for professional

misconduct."  AC ¶ 72.  As an initial matter, Defendants vigorously dispute that the Board had any

role in publicizing the charges against Dr. Robb and proffers sworn testimony that it was the DPH

---

[14]     To the extent Dr. Robb refers to the Board's earlier May 4, 2015 denial of his
motion to dismiss, that decision likewise can in no way be used to infer an illegal conspiracy to
remove Dr. Robb from the market.  In that decision, the Defendant Board properly rejected Dr.
Robb's clearly erroneous argument for dismissal based on an entirely unsupportable
interpretation of *North Carolina State Board of Dental Examiners v. Federal Trade Commission*,
135 S. Ct. 1101 (2015).  *See* Doc. 5-9.

that did so simply as a matter of course, [Doc. 34-1 Ex. B] ¶¶ 6-10; further, the documents Dr. Robb proffered allegedly evidencing such publication by the Board provide no ascertainable support for Dr. Robb's allegation that it was the Board, rather than DPH, that published the charges, [Docs. 31-3, 31-4].  More important, however, is the fact that, without more, simply listing on a website the true fact that Dr. Robb was under investigation for professional misconduct in no way evinces an illegal conspiracy amongst the adjudicators to remove the target of that investigation from the relevant market.  *See Mayor and City Council of Baltimore*, 709 F.3d at 139 ("two vague references to isolated [behavior] among only three defendants" are insufficient to support inference of antitrust conspiracy).  To hold otherwise would place under the umbrella of an antitrust conspiracy an overwhelming amount of legitimate actions taken by regulatory boards comprised of industry members.

Moreover, even were Dr. Robb to have alleged properly "interdependent conduct," Dr. Robb makes only one allegation suggesting any of the circumstantial evidence or "plus factors" that would thereby be required for his claim to survive dismissal.  Dr. Robb alleges "[o]n information and belief [that] the three veterinarian members of the Defendant Board use vaccination protocols that rely solely upon the manufacturer's recommended dosage," and that thereby "[s]ize-appropriate vaccination protocols like Dr. Robb's vaccination protocols thus represent a direct financial threat to the veterinarian Individual Defendants."[15]  AC ¶¶ 56-57; *see also* Doc. 44, at 22 (describing such as an "enormous incentive to restrain trade").  Although this may demonstrate a theoretical "common motive to conspire" amongst the Veterinarian Defendants, it is insufficient to establish an antitrust

---

[15]     This motive cannot even apply to the two members of the Board who do not have any demonstrated pecuniary motive to remove Dr. Robb from the market, Defendants Bernhard and O'Neill.  The claims against them are therefore not just without merit, but largely frivolous.

conspiracy when there exists an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for any parallel conduct:  compliance with their statutory duty to adjudicate claims brought by the Connecticut DPH.  Therefore, the evidence of the Veterinarian Defendants' common motive to conspire does not come close to "exclud[ing] the possibility of independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Mayor and City Council of Baltimore*, 709 F.3d at 137 ("even if a plaintiff alleges . . . "plus factors" . . . these facts must still lead to an inference of conspiracy").  Any regulatory board comprised of industry members with a statutory duty to adjudicate regulatory violations will almost always have some common motive to conspire (*i.e.*, excluding at least one competitor from the market).  That motive simply cannot be independently sufficient to infer an antitrust conspiracy.

In this regard, this case is far from *North Carolina State Board of Dental Examiners*, the Supreme Court's affirmance of which was and is relied on extensively by Dr. Robb.  As summarized by the circuit court, that case was "about a state board run by private actors in the marketplace *taking action outside of the procedures mandated by state law* to expel a competitor from the market."  717 F.3d at 375 (emphasis added) (addressing board members' discretionary decision to send cease-and-desist letters to competitors).  Here, Dr. Robb has not properly alleged any conduct of the individual Board members other then sitting in adjudication of an administrative proceeding brought by another state agency, *an action the Board members are required to take under state law*.  *See* C.G.S. § 20-196b (the Board "*shall* (1) hear and decide matters concerning suspension or revocation of licensure, (2) adjudicate complaints filed against practitioners licensed under this chapter and (3) impose sanctions where appropriate" (emphasis added)).  Again, to thereby hold that Dr. Robb's bare allegations make out an antitrust conspiracy would effectively mean that nearly all actions of an

adjudicative body controlled by a majority of industrial participants would constitute an antitrust conspiracy *per se*, an unsupportable argument that Plaintiff initially proffered, but wisely abandoned.[16]

In sum, Dr. Robb has failed to plead a single factual allegation affirmatively evincing the existence of an agreement amongst the Defendants, and can point to no proper allegations of Defendants' conduct from which this Court can remotely infer such an agreement. Dr. Robb is thereby forced to rely solely on his allegation that the Veterinarian Defendants had a common incentive to foreclose veterinarians such as Dr. Robb from the market. Such naked identification of a theoretical motive to conspire, without significantly more, is far from sufficient to establish the plausible existence of an agreement amongst competitors. Dr. Robb has thereby failed to allege a plausible claim that the Defendants have conspired with each other. His antitrust claim must be dismissed.

With such a clear and adequate ground for dismissal based upon Defendants' substantive antitrust defense, the Court need not address Defendants' other arguments (as to immunity, abstention, or exhaustion), many of which implicate constitutional concerns. This is because judges are clearly directed to avoid unnecessary adjudications as to questions of constitutional law. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988) (collecting cases discussing the "fundamental and longstanding principle of judicial restraint [that] requires courts avoid reaching constitutional questions in advance of the necessity of deciding them"); *see also*

---

[16]     As Dr. Robb admitted in his reply brief in support of his preliminary injunction, "the Board's argument that Dr. Robb has 'grossly misconstrued' the holding of *North Carolina State Board of Dental Examiners* . . . is now moot because Dr. Robb's verified amended complaint (Dkt. 30) does not allege that the Board is violating the federal antitrust laws by way of its composition alone." Doc. 31, at 4.

*Burton v. U.S.*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case").  Here, Dr. Robb's antitrust claim is clearly deficient for the reasons discussed above, and any further ruling would be unnecessary.

## V.      Conclusion

The record in this case makes manifest the sincerity of spirit, even devotion, with which Dr. Robb, an experienced and successful practitioner of veterinary medicine, asserts that it is unnecessary, dangerous and contrary to sound practice to require that the full dosage of rabies vaccine administered to a Great Dane also be administered to a Chihuahua.  However, such a requirement appears to be envisioned by the Connecticut Department of Public Health, and forms the gravamen of its administrative charge against Dr. Robb.  Presumably the Board will eventually adjudicate that charge.

The Court is constrained to conclude that Dr. Robb's complaint must be dismissed because it does not allege a viable antitrust claim under the Sherman Act.  In the absence of a viable claim under the Constitution or a federal statute, the limited jurisdiction of this United States District Court does not extend to righting whatever wrongs, however real, Dr. Robb may have identified.  The Rule of Law that courts such as this one enforce is a secular law.  The Constitution places spiritual questions beyond the competence of courts.  If Connecticut's rules with respect to rabies vaccine dosages should be changed, the Legislature and Governor must be asked to change them.

For the reasons stated above, Defendants' Motion to Dismiss [Doc. 39] is GRANTED.  The following motions are DENIED AS MOOT:  (i) Plaintiff's Motion for Preliminary Injunction [Doc. 4]; (ii) Proposed Interveners' Emergency Motion to Intervene [Doc. 21]; and (iii) Proposed

Interveners' Proposed Joinder in Defendants' Motion to Dismiss the Amended Complaint [Doc. 43].

The Clerk of Court is directed to enter judgment for the Defendants, dismissing this action, and to

close the file.

**It is SO ORDERED.**


**Dated:   New Haven, Connecticut**
          **January 20, 2016**

                                            */s/ Charles S. Haight, Jr.*
                                            **CHARLES S. HAIGHT, JR.**
                                            **Senior United States District Judge**